IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

Ex Rel

    PETER SALVATORI and
    SARA C. IVESON
        Plaintiffs

vs.

TENET HEALTHCARE CORPORATION,
GRADUATE HOSPITAL, HAHNEMANN
UNIVERSITY HOSPITAL, MEDICAL
COLLEGE OF PENNSYLVANIA
HOSPITAL, CITY HOSPITAL, ELKINS
PARK HOSPITAL, CATHOLIC HEALTH
EAST, OUR LADY OF LOURDES
MEDICAL CENTER, ST. FRANCIS
MEDICAL CENTER, TEMPLE
UNIVERSITY HOSPITAL, BARNERT
HOSPITAL, CHRIST HOSPITAL, CLARA
MAASS MEDICAL CENTER,
COMMUNITY MEDICAL CENTER,
HACKENSACK UNIVERSITY MEDICAL
CENTER, KIMBALL MEDICAL
CENTER, NEWARK BETH ISRAEL
MEDICAL CENTER, PASCACK
VALLEY HOSPITAL, RARITAN BAY
MEDICAL CENTER, ROBERT WOOD
JOHNSON UNIVERSITY HOSPITAL,
ROBERT WOOD JOHNSON
UNIVERSITY HOSPITAL AT
HAMILTON, SAINT BARNABAS
MEDICAL CENTER, ██████████
████████ ST. PETER'S NEW
BRUNSWICK, UNIVERSITY OF
MEDICINE AND DENTISTRY OF NEW
JERSEY – UNIVERSITY HOSPITAL,
WARREN HOSPITAL, ██████████
██████████████████████

        Defendants.

CIVIL ACTION NO. 02 - 8309

FILED IN CAMERA AND UNDER SEAL
JURY TRIAL DEMANDED

**COMPLAINT**
**FOR MONEY DAMAGES AND CIVIL PENALTIES**
**UNDER THE FALSE CLAIMS ACT 31 U.S.C. §§ 3729-3732**

## I.    NATURE OF ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and false or fraudulent claims made or caused to be made by the defendants to the United States in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

2.      The False Claims Act provides that any person who knowingly submits or causes to be submitted to the government a false or fraudulent claim for payment or approval is liable for a civil penalty up to $11,000 for each such claim, plus three times the amount of damages sustained by the Government.

3.      Pursuant to the False Claims Act, Plaintiffs seek to recover on behalf of the United States damages and civil penalties arising from false or fraudulent claims that defendants submitted or caused to be submitted to Government-funded health insurance programs.

4.      Under the scheme, the defendant hospitals grossly inflate their current routine and ancillary charges for inpatient hospitalization covered under Part A of the Medicare Program and submit those grossly inflated charges electronically to the Fiscal Intermediary for the purpose of causing the Fiscal Intermediary to pay a false claim.  The scheme is designed to cause otherwise routine cases to be considered as atypical and thus subject to additional payments known as outlier payments, the effect of which is to improperly increase the hospital's revenues.

2

5. 

6.

## II.   JURISDICTION

7.     This Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the defendants resides or transacts business in the Eastern District of Pennsylvania, and because at least one of the agencies to whom defendants submitted false claims or caused false claims to be submitted maintains its headquarters in this District.  In addition, the defendants have sufficient contacts with the United States of America.

## III.   VENUE

8.     Venue is proper in the Eastern District of Pennsylvania under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because at least one of the defendants resides or transacts business in this District.

## IV.    **PARTIES**

9.    The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), on behalf of the Medicare program.

10.    Relator, Peter Salvatori, is an adult individual residing in the Commonwealth of Pennsylvania. He brings this action for violations of the False Claims Act on behalf of himself and the United States pursuant to 31 U.S.C. § 3730(b)(1). He has knowledge of the violations and allegations discussed herein. Salvatori avers that he has fully complied with the requirements of 31 U.S.C. § 3730(b)(2).

11.    Relator, Sara C. Iveson, is an adult individual residing in the Commonwealth of Pennsylvania. She brings this action for violations of the False Claims Act on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1). She has knowledge of the violations and allegations discussed herein. Iveson avers that she has fully complied with the requirements of 31 U.S.C. § 3730(b)(2).

12.    Defendant Tenet Healthcare Corporation ("Tenet") is a publicly held corporation organized under the laws of Nevada with its principal place of business located at 3820 State Street, Santa Barbara, California.

13.    Tenet, whose stock trades on the New York and Pacific Stock Exchanges, is a nationwide provider of health care services. Tenet owns or operates 115 acute care hospitals and related businesses within 17 states, including defendants Graduate Hospital ("Graduate"), Hahnemann University Hospital ("Hahnemann"), Medical College of Pennsylvania ("MCP"), and Elkins Park Hospital ("Elkins Park"). Attached hereto as

4

Exhibit "A" and incorporated herein by reference is a chart listing all hospitals currently or formerly owned, operated or managed by Tenet. Relators have not included the hospitals listed in Exhibit "A" as defendants in this matter. On information and belief, Relators aver that the scheme to submit false and fraudulent claims for the purpose of obtaining outlier payments to which Tenet, Graduate, Hahnemann, MCP, and Elkins Park are not otherwise entitled may be in use by other hospitals owned and operated by Tenet throughout its entire health care services system.

14.     Defendant Graduate is a "for profit" hospital with its principal place of business located at 1800 Lombard Street, Philadelphia, Pennsylvania.

15.     Defendant Hahnemann is a "for profit" hospital with its principal place of business located at Broad and Vine Streets, Philadelphia, Pennsylvania.

16.     Defendant MCP is a "for profit" hospital with its principal place of business located at 3300 Henry Avenue, Philadelphia, Pennsylvania.

17.     Defendant City Hospital was a hospital owned and operated by Tenet with its principal place of business located at City Line Avenue, Philadelphia, Pennsylvania. On information and belief, City Hospital was closed by Tenet in or about April 2000.

18.     Defendant Elkins Park is a hospital with its principal place of business located at 60 East Township Line Road, Elkins Park, 19117.

19.     Defendant Catholic Health East is a multi-institutional, Catholic health system with its principal place of business located at 14 Campus Boulevard, Suite 300, Newtown Square, Pennsylvania.

20.     Catholic Health East is one of the nation's largest health care systems, and is compromised of 31 hospitals, 42 free-standing and hospital-based skilled nursing

facilities, 21 residential facilities, and 3 free-standing behavioral health facilities,

including defendants Our Lady of Lourdes Medical Center ("Our Lady of Lourdes") and

St. Francis Medical Center ("St. Francis").

21.     Defendant Our Lady of Lourdes is a hospital with its principal place of

business at 1600 Haddon Avenue, Camden, New Jersey.

22.     Defendant St. Francis is a hospital with its principal place of business at

601 Hamilton Avenue, Trenton, New Jersey 08629.

23.     Defendant Temple University Hospital ("Temple") is a hospital with its

principal place of business at 400 Carnell Hall, 1801 North Broad Street, Philadelphia,

PA 19122.

24.     Defendant Barnert Hospital ("Barnert") is a hospital with its principal

place of business at 680 Dr. Martin Luther King Jr. Way, Paterson, New Jersey 07514.

25.     Defendant Christ Hospital is a hospital with its principal place of business

at 176 Palisade Avenue, Jersey City, New Jersey 07306.

26.     Defendant Clara Maass, M.C. ("Clara Maass") is a hospital with its

principal place of business at One Clara Maass Drive, Belleville, New Jersey 07109.

27.     Defendant Community Medical Center ("Community Medical") is a

hospital with its principal place of business at 99 Highway 37 West, Toms River, New

Jersey 08755.

28.     Defendant Hackensack University Medical Center ("Hackensack") is a

hospital with its principal place of business at 30 Prospect Avenue, Hackensack, New

Jersey 07601.

29.     Defendant Kimball Medical Center ("Kimball") is a hospital with its principal place of business at 600 River Avenue, Lakewood, New Jersey 08701.

30.     Defendant Newark Beth Israel Medical Center ("Newark") is a hospital with its principal place of business at 201 Lyons Avenue at Osborne Terrace, Newark, New Jersey 07112.

31.     Defendant Pascack Valley ("Pascack") is a hospital with its principal place of business at Old Hook Road, Westwood, New Jersey 07675.

32.     Defendant Raritan Bay Medical Center ("Raritan") is a hospital with its principal place of business at 530 New Brunswick Avenue, Perth Amboy, New Jersey.

33.     Defendant Robert Wood Johnson University Hospital ("Robert Wood") is a hospital with its principal place of business at One Robert Wood Johnson Place, New Brunswick, New Jersey 08901.

34.     Defendant Robert Wood Johnson University at Hamilton ("RWJU") is a hospital with its principal place of business at One Hamilton Place, Hamilton, New Jersey 08690.

35.     Defendant Saint Barnabas Medical Center ("Saint Barnabas") is a hospital with its principal place of business at 94 Old Short Hills Road, Livingston, New Jersey 07039.

36.     ████████████████████████████████████████

████████████████████████████████████████████████

██████████████

37.     Defendant St. Peter's New Brunswick ("St. Peter's") is a hospital with its principal place of business at 254 Easton Avenue, New Brunswick, New Jersey 08903.

38.     Defendant University of Medicine and Dentistry of New Jersey –
University Hospital ("UMDNJ") is a hospital with its principal place of business at 150
Bergen Street, Newark, New Jersey 07103.

39.     Defendant Warren Hospital ("Warren") is a hospital with its principal
place of business at 185 Roseberry Street, Phillipsburg, New Jersey 08865.



40.

41.

42.

V.      **THE LAW**

A.      **The False Claims Act**

43.     The False Claims Act ("FCA") provides in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to
> an officer or employee of the United States Government . . . a false or
> fraudulent claim for payment or approval; (2) knowingly makes, uses,
> or causes to be made or used, a false record or statement to get a false
> or fraudulent claim paid or approved by the Government; (3) conspires
> to defraud the Government by getting a false or fraudulent claim paid
> or approved by the Government; . . .

* * *

is liable to the United States Government for a civil penalty of not less than

$5,500 and not more than $11,000, plus 3 times the amount of damages which the

Government sustains because of the act of that person . . .

> (b) For purposes of this section, the terms "knowing" and "knowingly"
> mean that a person, with respect to information (1) has actual
> knowledge of the information; (2) acts in deliberate ignorance of the
> truth or falsity of the information; or (3) acts in reckless disregard of
> the truth or falsity of the information, and no proof of specific intent to
> defraud is required.

31 U.S.C. § 3729.

## VI.   THE FEDERAL HEALTHCARE PROGRAMS

### A.   The Medicare Program

44.     In 1965, Congress enacted Title XVIII of the Social Security Act, known

as the Medicare program, to pay for the costs of certain healthcare services based on age,

disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.

45.     Part A of the Medicare Program authorizes payment for institutional care,

including hospitalization. *See* 42 U.S.C. §§ 1395c-1395I-4. Relators aver on information

and belief that the hospital defendants, Tenet and Catholic Health East derive a

substantial portion of their revenue from the Medicare Program.

46.     CMS, an agency of HHS, is responsible on behalf of HHS for the

administration of the Medicare Program.

47.     Under Part A of the Medicare Program, CMS makes payments to hospitals

after services for inpatient care have been rendered. Medicare enters into provider

agreements with hospitals in order to establish the hospitals' eligibility to participate in

the Medicare Program.

48.    To assist in the administration of Medicare Part A, CMS contracts with "Fiscal Intermediaries," 42 U.S.C. § 1395h, typically private insurance companies that undertake responsibility for *inter alia*, processing and paying claims to participating hospitals for in-patient services and for auditing hospital cost reports.

## VII.    MEDICARE'S HISTORICAL  PAYMENT SYSTEMS

### A.    Retrospective Payment System

49.    From fiscal years 1967 through 1984, hospitals were paid on the basis of the actual cost of providing services to Medicare beneficiaries.

50.    Under this system, hospitals received interim payments during the year for in-patient services provided to Medicare patients.

51.    At the end of the year, each hospital submitted a cost report to the Fiscal Intermediary which itemized expenditures incurred in the hospital's prior accounting period or fiscal year.

52.    Based upon the cost report, which was subject to audit by the Fiscal Intermediary, Medicare then made additional payments to the hospital to reimburse it for the actual cost of care.

53.    This retrospective payment system led to a dramatic increase in Medicare costs from 1967 to 1983 as annual payments to hospitals increased from $3 billion to $37 billion.

54.    During this time period, Federal policy-makers viewed the health care system as wasteful, as the inflationary costs of this system were enormous.

### B.    Prospective Payment System

55.    In 1983, Congress adopted a Prospective Payment System ("PPS") to curtail the amount of resources the federal government spent on medical care for the elderly and disabled.

56.    The Government gave primary authority for implementing the PPS to HCFA, now known as CMS.

57.    Under the PPS, Medicare pays predetermined amounts to hospitals for inpatient treatment.

58.    The purpose of the PPS is to award hospitals that are efficient in providing services and to cause inefficient hospitals to become efficient in the delivery of patient services.

59.    A key part of the PPS is the categorization of medical and surgical services into diagnosis-related groups ("DRGs").

60.    The DRGs are a patient classification system which provides a means of relating the type of patients a hospital treats to the costs incurred by the hospital for that treatment.  Payment for inpatient hospital services is made on the basis of a rate per discharge that varies according to the DRG to which a beneficiary's stay is assigned.

61.    The DRGs "bundle" those services (labor and non-labor resources) that are required to treat a patient with a particular disease or condition.

62.    The DRG payment rates cover most routine operating costs attributable to patient care, including nursing services, room and board, and diagnostic and ancillary services.

63.    The CMS creates a rate of payment based on the "average" cost to deliver care (bundled services) to a patient with a particular disease or condition.  The average cost is determined by dividing the charges by the number of cases within the DRG.

64.    The DRGs are also given a certain weight based upon the complexity or difficulty of treatment and the utilization of services required to treat the condition.

65.    The greater the weight assigned to the DRG, the higher the ultimate compensation to the hospital.

C.    **Outlier Payments**

66.    All hospitals receiving Medicare payments are required to submit their cost reports to the Fiscal Intermediary on an annual basis.

67.    The Fiscal Intermediary is required to audit the cost report.  Once audited, it is referred to as an "audited cost report" or a "settled cost report".

68.    Under the retrospective payment system, the settled cost report was audited promptly since it was used by the Fiscal Intermediary to determine the amounts due to the hospitals as compensation for actual costs incurred in the delivery of services to beneficiaries during the fiscal year.

69.    Once Medicare changed from a retrospective payment system to a PPS, the importance of the cost reports diminished because there no longer was a need to use the settled cost report to determine the actual compensation due to a hospital for services rendered to a beneficiary.

70.    Therefore, with the transition to a PPS, the Fiscal Intermediary devoted fewer resources to auditing the cost reports which resulted in a delay in auditing those reports.

71.     Relators aver upon information and belief that the delay in auditing the hospital cost reports ranges from three years in Pennsylvania to four years in New Jersey.

72.     Section 1886(d)(5)(A) of the Social Security Act requires CMS to pay an additional amount beyond the basic prospective payment amount for a hospital inpatient case that involves an extremely long length of stay or extraordinarily high costs when compared to other discharges classified in the same DRG.  Such cases are "atypical" and are known as "outliers".

73.     42 C.F.R. § 412.84(a) provides that "[a] hospital may request its intermediary to make an additional payment for inpatient hospital services that meet the criteria established [for outliers] in accordance with § 412.80(a)."

74.     While the purpose of the PPS is to reward the efficient delivery of services by hospitals, the purpose of the outlier payment is to protect hospitals from significant financial loss in individual atypical cases.

75.     For cost outliers, the additional payment represents the marginal cost of providing care beyond the cost outlier threshold which is established annually by CMS. Charges for the additional care are adjusted to cost using a ratio of costs to charges ("RCC"). The cost outlier payment is equal to 80% of the excess of the cost determined by application of the outlier formula.

76.     The formula for computing outlier payments is:

$$80 * (charges * RCC) - (DRG + IME^1 + DSH^2 + outlier threshold)$$

---

[1] IME stands for the indirect medical education payment.  Teaching institutions' DRG payments are increased by a percentage (the indirect medical education payment) based upon the ratio of interns and residents to hospital beds since those institutions are assumed to have higher costs due to extra tests and procedures performed for teaching purposes.
[2] DSH stands for the disproportionate share payment.  Disproportionate share payments are additional payments to hospitals that treat a large percentage of low income patients.

77.     To qualify for outlier payments, a hospital's charges for a discharge, adjusted to cost, must exceed the payment rate for the DRG by a fixed dollar amount, adjusted for geographic variation in costs. *See* 42 C.F.R. § 412.80(a)(2).

78.     The purpose of the outlier payment is to compensate the hospital for the use of an extraordinary amount of resources in the atypical case. *See* 42 U.S.C. § 1395ww(d)(5)(A); 48 FR 39752 § III. B. 3; 42 C.F.R. Parts 405, 409, 489 (September 1, 1983).

79.     42 C.F.R. § 412.84(h) requires the Fiscal Intermediary to compute the RCC annually for each hospital based on the latest available settled cost report for that hospital and charge data for the same time period as that covered by the cost report.

80.     On information and belief, Relators aver that the most recent settled cost reports used by the Fiscal Intermediary to determine the propriety of outlier payments in New Jersey are approximately four years old.

81.     On information and belief, Relators aver that the most recent settled cost reports used by the Fiscal Intermediary to determine the propriety of outlier payments in Pennsylvania are approximately three years old.

82.     The outlier threshold is determined annually by CMS.

83.     The outlier threshold for fiscal year 1997 was $9,700.

84.     The outlier threshold for fiscal year 1998 was $11,050, an increase of 13.92% over 1997.

85.     The outlier threshold for fiscal year 1999 was $11,100, an increase of .45% over 1998.

86.     The outlier threshold for fiscal year 2000 was $14,050, an increase of 26.58% over 1999.

87.     The outlier threshold for fiscal year 2001 was $17,550, an increase of 24.91% over 2000.

88.     The outlier threshold for fiscal year 2002 is $21,025, an increase of 19.8% over 2001.

89.     The total amount of outlier payments made for discharges in a fiscal year may not be less than 5% nor more than 6% of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.  42 U.S.C. § 1395 ww(d)(5)(A)(iv).

**D.     Balanced Budget Act of 1997**

90.     In 1997, Congress passed the Balanced Budget Act of 1997 ("BBA") with the intent of saving over $103 billion over a five-year period.

91.     The BBA, *inter alia*, amended the Social Security Act and other acts to revise the Medicare and Medicaid programs.

92.     The revisions to the Medicare and Medicaid programs included the reduction of various payment rates to certain health care providers.

93.     Changes in Medicare payments mandated by the BBA became effective October 1, 1997.

94.     Those changes are being phased in over a five-year period with the most significant changes phased in by October 1, 1998.

95.     The BBA provides for incremental Medicare reimbursement cuts and proposes reductions in outlier payments.

96.    The BBA significantly reduces Medicare reimbursements to hospitals and health systems.

## VIII.   DEFENDANTS' SCHEME TO INCREASE OUTLIER PAYMENTS

97.    The largest payors for in-patient healthcare services are Medicare, Medicaid, Blue Cross and managed care insurers.

98.    Each program reimburses hospitals for inpatient services based on prospective rates.

99.    Where payors other than Medicare reimburse hospitals for inpatient services on a percentage of charge basis, there is generally a cap on the percentage the hospital may increase charges on an annual basis.

100.    With the exception of Medicare, Blue Cross and other managed care payors will not pay hospitals any additional monies for hospital charges that exceed the rate established by the payors.

101.    However, under the outlier payment formula, the level of outlier reimbursements under the Medicare inpatient prospective payment system increase significantly when a hospital substantially increases its current charges for inpatient services.

102.    The level of outlier reimbursements under the Medicare PPS increases with a higher RCC.

103.    Relators aver on information and belief that the Fiscal Intermediary applies the RCC from the last settled cost report, which is higher than the RCC in the most current unaudited cost report, to the outlier formula to determine if the hospital is entitled to payment. Under the formula, the RCC from the last settled cost report is

16

multiplied by the current charges submitted by the hospital to determine the amount of the outlier payment.

104.    In order to obtain outlier payments to which the defendant hospitals are not otherwise entitled, the defendant hospitals have grossly inflated the current charges for routine and ancillary inpatient services.

105.    Routine charges are the equivalent of room and board.

106.    Ancillary charges are all other charges for inpatient services computed on an ala carte basis.

107.    After grossly inflating these routine and ancillary charges, the defendant hospitals electronically submit UB-92 forms containing these grossly inflated routine and ancillary charges to the Fiscal Intermediary for payment.

108.    The Fiscal Intermediary performs an electronic calculation of the information contained in the UB-92 to determine if the hospital is entitled to any outlier payment.

109.    Since the Fiscal Intermediary was the entity responsible for auditing the last settled cost report, it does not look beyond the last settled cost report, *i.e.,* to the most current unaudited cost report, to test the propriety of the defendant hospitals' requests for outlier payments.

110.    Under the defendants' scheme, the grossly inflated current charges for routine and ancillary services have the effect of falsely causing otherwise routine cases to be considered as atypical and thus subject to outlier payments.

111.    Relators aver upon information and belief that the gross inflation of routine and ancillary charges has no purpose other than to defraud Medicare since all

payors other than Medicare, (i.e., Blue Cross, etc.) cap their payments to the hospitals and the increases in current charges thus are irrelevant.

112.    The only means for the defendant hospitals to obtain significant additional revenue for in-patient services is from Medicare. The only way to do that is to grossly inflate the current charges and multiply those charges by the RCC from the last settled cost report which in New Jersey is approximately four years old and in Pennsylvania is approximately three years old.

113.    The Medpar data for the defendant hospitals, ███████████████ ███ evidences the fraud scheme during the years 1997 through 2001. While Relators believe, and therefore aver that the fraud scheme is continuing, the Medpar data is not available for 2002.

114.    The Medpar data for the defendant hospitals reveals that the number of patient days per case has decreased since 1997.

115.    As a result, the average patient days for outlier cases have decreased significantly.

116.    Between 1997 and the present, the outlier threshold has been increased 116.75% by CMS from $9,700 in 1997 to $21,025 in 2002.

117.    The Medpar data indicates that for this same period, during which patient days decreased and the outlier threshold increased, outlier payments to the defendant hospitals increased exponentially.

118.    ████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████



119.

120.

121.

122.

123.

124.    While outlier payments and the number of outlier cases have increased, the average number of patient days per outlier case at the defendant hospitals are decreasing dramatically, thereby demonstrating that the defendant hospitals cases now qualifying for outlier payments are not the atypical cases as defined in the Regulations.

125.    The defendant hospitals' number of outlier cases and payments have increased dramatically despite the annual increase in outlier thresholds from 1997 through 2002.

126.    On information and belief, the defendant hospitals' fraud scheme is continuing and, in part, the impact of the scheme has resulted in the actual amount of outlier payments in fiscal year 2002 totalling 7.2% of total DRG payments, well above

the 5% to 6% statutory cap for outlier payments contained in 42 U.S.C. §

1395ww(d)(5)(A)(iv).

## IX.  PHILADELPHIA BASED HOSPITALS AND THE OPERATION OF THE SCHEME

### A.  TENET HEALTHCARE

127.   Tenet is the second largest investor-owned for profit health care services company in the United States.

128.   Tenet receives payments for patient care from, *inter alia*, private insurance carriers, federal Medicare programs, health maintenance organizations, preferred provider organizations, and state Medicaid programs.

129.   Payments from Medicare account for a significant portion of Tenet's operating revenues and Relators aver upon information and belief that for fiscal 2003 twenty-three percent (23%) of its Medicare payments will be in the form of outlier payments.

130.   The BBA resulted in reductions to Tenet's revenues and earnings.  For example, as a result of the BBA, Tenet received $100 million less in reimbursements from the federal government in fiscal year 1999 than it received in fiscal year 1998.

131.   Tenet entered the Philadelphia area health care market in November of 1998, when it purchased eight hospitals from the bankrupt Allegheny Health System for $345 million.

132.   Prior to the acquisition, the eight Philadelphia hospitals were losing large amounts of money.

133.   Operating income before depreciation and amortization turned positive for the Philadelphia hospitals in January of 1999.

134.    In January of 2000, Tenet executives expressed concerns that it might not attain the profits it expected from its Philadelphia-area hospitals.

135.    In or about February of 2000, Tenet announced profit projections for its Philadelphia-area hospitals of $15 million in 2000.

136.    For fiscal year 2000, five of the eight Philadelphia-area hospitals owned by Tenet (Graduate, Hahnemann, MCP, St. Christophers and Warminster) generated a profit.

137.    Tenet's Philadelphia-area hospitals attained an $11.8 million operating profit for fiscal year 2000.

**B.      Implementation of the Scheme by Individual Tenet Hospitals**

1.      Hahnemann University Hospital

138.    Between 1999 and 2001, the average length of stay decreased by 11.4 days from 24.2 days to 12.8 days, a decrease of 47.11%.

139.    Between 1999 and 2001, Hahnemann's average routine charges per day increased by $2,308 from $2,411 to $4,719, an increase of 95.73%.

140.    Between 1999 and 2001, Hahnemann's average ancillary charges per day increased by $5,466 from $4,134 to $9,600, an increase of 132.22%.

141.    Between 1999 and 2001, Hahnemann's outlier cases cumulatively increased by 2,125[3] from 343 in 1999.

---

[3] The increase in outlier cases represents the <u>cumulative</u> increase in outlier cases from the base year to 2001. Cumulative increases are the sum of the differences of increased revenue for each year from the base year through the last year reflected on the Medpar data. The term base year reflects the year for any hospital defendant immediately preceding the year in which the effect of the fraud scheme resulted in significantly increased outlier payments for the defendant hospitals.

142.   Between 1999 and 2001, Hahnemann's outlier payments cumulatively increased by $69,687,524[4] from $4,941,962 in 1999.

2.   Graduate Hospital

143.   Between 1999 and 2001, the average length of stay decreased by 1.9 days from 15.8 days to 13.9 days, a decrease of 12%.

144.   Between 1999 and 2001, Graduate's average routine charges per day increased by $1,116 from $2,117 to $3,233, an increase of 52.72%.

145.   Between 1999 and 2001, Graduate's average ancillary charges per day increased by $2,391 from $5,239 to $7,630, an increase of 45.64%.

146.   Between 1999 and 2001, Graduate's outlier cases cumulatively increased by 401 cases from 499 in 1999.

147.   Between 1999 and 2001, Graduate's outlier payments cumulatively increased by $12,267,728 from $9,047,115 in 1999.

3.   MCP Hospital

148.   Between 1999 and 2001, the average length of stay decreased by 11.2 days from 25.7 days to 14.5 days, a decrease of 43.58%.

149.   Between 1999 and 2001, MCP's average routine charges per day increased by $1,906 from $2,694 to $4,600, an increase of 70.75%.

150.   Between 1999 and 2001, MCP's average ancillary charges per day increased by $3,082 from $3,097 to $6,179, an increase of 99.52%.

151.   Between 1999 and 2001,MCP's outlier cases cumulatively increased by 1,012 cases from 135 in 1999.

---

[4] The increase in outlier payments represents the cumulative increase in outlier payments from the base year to 2001.

152.   Between 1999 and 2001, MCP's outlier payments cumulatively increased by $20,720,491 from $3,691,153 in 1999.

### 4.   City Hospital

153.   Between 2000 and 2001, the average length of stay decreased by 3.3 days from 26.5 days to 23.2 days, a decrease of 12.45%.

154.   Between 2000 and 2001, City Hospital's average routine charges per day increased by $752 from $1,230 to $1,982, an increase of 61.14%.

155.   Between 2000 and 2001, City Hospital's average ancillary charges per day increased by $1,987 from $2,879 to $4,866, an increase of 69.02%.

156.   Between 2000 and 2001, City Hospital's outlier cases cumulatively increased by 8 cases from 56 in 2000.

157.   Between 2000 and 2001, City Hospital's outlier payments cumulatively increased by $568,415 from $634,580 in 2000.

### 5.   Elkins Park

158.   Between 1999 and 2001, the average length of stay decreased by 7.6 days from 22.5 days to 14.9 days, a decrease of 33.78%.

159.   Between 1999 and 2001, Elkins Park's average routine charges per day increased by $1,226 from $1,367 to $2,593, an increase of 89.69%.

160.   Between 1999 and 2001, Elkins Park's average ancillary charges per day increased by $1,920 from $2,378 to $4,298, an increase of 80.74%.

161.   Between 1999 and 2001, Elkins Park's outlier cases cumulatively increased by 131 cases from 71 in 1999.

162.    Between 1999 and 2001, Elkins Park's outlier payments cumulatively increased by $1,288,901 from $792,991 in 1999.

**C.      Temple University**

163.    Between 2000 and 2001, the average length of stay decreased by 8.4 days from 41 days to 32.6 days, a decrease 20.49%.

164.    Between 2000 and 2001, Temple's average routine charges per day increased by $744 from $2,118 to $2,862, an increase of 35.13%.

165.    Between 2000 and 2001, Temple's average ancillary charges per day increased by $1,741 from $3,906 to $5,647, an increase of 44.57%.

166.    Between 2000 and 2001, Temple's outlier cases cumulatively increased by 113 cases from 139 in 2000.

167.    Between 2000 and 2001, Temple's outlier payments cumulatively increased by $2,579,968 from $1,817,075 in 2000.

**X.      NEW JERSEY HOSPITALS**

**A.      Our Lady of Lourdes**

168.    Between 2000 and 2001, the average length of stay decreased by 13.4 days from 33.3 days to 19.9 days, a decrease of 40.24%.

169.    Between 2000 and 2001, Our Lady of Lourdes' average routine charges per day increased by $1,066 from $1,408 to $2,474, an increase of 75.71%.

170.    Between 2000 and 2001, Our Lady of Lourdes' average ancillary charges per day increased by $2,062 from $1,633 to $3,695, an increase of 126.27%.

171.    Between 2000 and 2001, Our Lady of Lourdes' outlier cases cumulatively increased by 510 cases from 192 in 2000.

172.   Between 2000 and 2001, Our Lady of Lourdes' outlier payments cumulatively increased by $9,233,951 from $2,409,988 in 2000.

**B.   St. Francis**

173.   Between 1999 and 2001, the average length of stay decreased by 11.5 days from 25.1 days to 13.6 days, a decrease of 45.82%.

174.   Between 1999 and 2001, St. Francis' average routine charges per day increased by $3,809 from $1,987 to $5,796, an increase of 191.70%.

175.   Between 1999 and 2001, St. Francis' average ancillary charges per day increased by $1,654 from $1,760 to $3,414, an increase of 93.98%.

176.   Between 1999 and 2001, St. Francis' outlier cases cumulatively increased by 630 cases from 166 in 1999.

177.   Between 1999 and 2001, St. Francis' outlier payments cumulatively increased by $11,464,781 from $1,717,474 in 1999.

**C.   Barnert**

178.   Between 1999 and 2001, the average length of stay decreased by 17.8 days from 35.3 days to 17.5 days, a decrease of 50.42%.

179.   Between 1999 and 2001, Barnert's average routine charges per day increased by $2,063 from $867 to $2,930, an increase of 237.95%.

180.   Between 1999 and 2001, Barnert's average ancillary charges per day increased by $1,057 from $803 to $1,860, an increase of 131.63%.

181.   Between 1999 and 2001, Barnert's outlier cases cumulatively increased by 218 cases from 48 in 1999.

182.    Between 1999 and 2001, Barnert's outlier payments cumulatively increased by $2,782,428 from $309,059 in 1999.

**D.    Christ Hospital**

183.    Between 2000 and 2001, the average length of stay decreased by 3.2 days from 34.8 days to 31.6 days, a decrease of 9.20%.

184.    Between 2000 and 2001, Christ Hospital's average routine charges per day increased by $1,251 from $2,199 to $3,450, an increase of 56.89%.

185.    Between 2000 and 2001, Christ Hospital's average ancillary charges per day increased by $17 from $930 to $947, an increase of 1.83%.

186.    Between 2000 and 2001, Christ Hospital's outlier cases cumulatively increased by 294 cases from 147 in 2000.

187.    Between 2000 and 2001, Christ Hospital's outlier payments cumulatively increased by $5,167,475 from $1,395,193 in 2000.

**E.    Clara Maass**

188.    Between 1998 and 2001, the average length of stay decreased by 11.6 days from 32.5 days to 20.9 days, a decrease of 35.69%.

189.    Between 1998 and 2001, Clara Maass' average routine charges per day increased by $2,688 from $1,912 to $4,600, an increase of 140.59%.

190.    Between 1998 and 2001, Clara Maass' average ancillary charges per day increased by $394 from $676 to $1,070, an increase of 58.28%.

191.    Between 1998 and 2001, Clara Maass' outlier cases cumulatively increased by 687 cases from 520 in 1998.

192.    Between 1998 and 2001, Clara Maass' outlier payments cumulatively increased by $12,268,606 from $4,733,149 in 1998.

**F.      Community Medical Center**

193.    Between 1997 and 2001, the average length of stay decreased by 8.6 days from 20.2 days to 11.6 days, a decrease of 42.57%.

194.    Between 1997 and 2001, Community Medical's average routine charges per day increased by $6,300 from $2,245 to $8,545, an increase of 280.62%.

195.    Between 1997 and 2001, Community Medical's average ancillary charges per day decreased by $1,512 from $2,115 to $603, a decrease of 71.49%.

196.    Between 1997 and 2001, Community Medical's outlier cases cumulatively increased by 15,364 cases from 915 in 1997.

197.    Between 1997 and 2001, Community Medical's outlier payments cumulatively increased by $258,592,816 from $5,290,526 in 1997.

**G.      Hackensack**

198.    Between 1997 and 2001, the average length of stay decreased by 5.7 days from 25.2 days to 19.5 days, a decrease of 22.62%.

199.    Between 1997 and 2001, Hackensack's average routine charges per day increased by $3,383 from $2,396 to $5,779, an increase of 141.19%.

200.    Between 1997 and 2001, Hackensack's average ancillary charges per day increased by $2,399 from $1,572 to $3,971, an increase of 152.61%.

201.    Between 1997 and 2001, Hackensack's outlier cases cumulatively increased by 1,964 cases from 987 in 1997.

202.   Between 1997 and 2001, Hackensack's outlier payments cumulatively increased by $49,321,260 from $12,714,021 in 1997.

**H.   Kimball**

203.   Between 1998 and 2001, the average length of stay decreased by 3.9 days from 14.6 days to 10.7 days, a decrease of 26.71%.

204.   Between 1998 and 2001, Kimball's average routine charges per day increased by $5,453 from $4,315 to $9,768, an increase of 126.37%.

205.   Between 1998 and 2001, Kimball's average ancillary charges per day decreased by $2,799 from $3,588 to 789, a decrease of 78.01%.

206.   Between 1998 and 2001, Kimball's outlier cases cumulatively increased by 5,211 cases from 1,047 in 1998.

207.   Between 1998 and 2001, Kimball's outlier payments cumulatively increased by $112,687,438 from $9,133,738 in 1998.

**I.   Newark**

208.   Between 1997 and 2001, the average length of stay decreased by 20 days from 40.3 days to 20.3 days, a decrease of 49.63%.

209.   Between 1997 and 2001, Newark's average routine charges per day increased by $6,097 from $1,412 to $7,509 an increase of 431.80%.

210.   Between 1997 and 2001, Newark's average ancillary charges per day increased by $473 from $1,064 to $1,537, an increase of 44.45%.

211.   Between 1997 and 2001, Newark's outlier cases cumulatively increased by 2,509 cases from 353 in 1997.

212.   Between 1997 and 2001, Newark's outlier payments cumulatively increased by $62,694,384 from $3,742,919 in 1997.

**J.     Pascack**

213.   Between 1998 and 2001, the average length of stay decreased by 11.1 days from 27.6 days to 16.5 days, a decrease of 40.22%.

214.   Between 1998 and 2001, Pascack's average routine charges per day increased by $1,863 from $1,450 to $3,313, an increase of 128.48%.

215.   Between 1998 and 2001, Pascack's average ancillary charges per day increased by $1,168 from $1,169 to $2,337, an increase of 99.91%.

216.   Between 1998 and 2001, Pascack's outlier cases cumulatively increased by 876 cases from 187 in 1998.

217.   Between 1998 and 2001, Pascack's outlier payments cumulatively increased by $15,862,566 from $2,023,622 in 1998.

**K.     Raritan**

218.   Between 1998 and 2001, the average length of stay decreased by 5.3 days from 29.6 days to 24.3 days, a decrease of 17.91%.

219.   Between 1998 and 2001, Raritan's average routine charges per day increased by $2,423 from $2,008 to $4,431, an increase of 120.67%.

220.   Between 1998 and 2001, Raritan's average ancillary charges per day increased by $560 from $1,098 to $1,658, an increase of 51%.

221.   Between 1998 and 2001, Raritan's outlier cases cumulatively increased by 1,362 cases from 706 in 1998.

222. Between 1998 and 2001, Raritan's outlier payments cumulatively increased by $23,881,546 from $6,170,114 in 1998.

**L.   Robert Wood Johnson**

223. Between 1999 and 2001, the average length of stay decreased by 5.5 days from 36.2 days to 30.7 days, a decrease of 15.19%.

224. Between 1999 and 2001, Robert Wood Johnson's average routine charges per day increased by $1,414 from $2,215 to $3,629, an increase of 63.84%.

225. Between 1999 and 2001, Robert Wood Johnson's average ancillary charges per day increased by $510 from $2,081 to $2,591, an increase of 24.51%.

226. Between 1999 and 2001, Robert Wood Johnson's outlier cases cumulatively increased by 779 cases from 384 in 1999.

227. Between 1999 and 2001, Robert Wood Johnson's outlier payments cumulatively increased by $20,453,917 from $6,307,957 in 1999.

**M.   RWJU**

228. Between 1997 and 2001, the average length of stay decreased by 25.2 days from 35.7 days to 10.5 days, a decrease of 70.59%.

229. Between 1997 and 2001, RWJU's average routine charges per day increased by $3,160 from $757 to $3,917, an increase of 417.44%.

230. Between 1997 and 2001, RWJU's average ancillary charges per day increased by $1,883 from $554 to $2,437, an increase of 339.89%.

231. Between 1997 and 2001, RWJU's outlier cases cumulatively increased by 4,056 cases from 109 in 1997.

232.    Between 1997 and 2001, RWJU's outlier payments cumulatively increased by $46,462,056 from $721,053 in 1997.

**N.    Saint Barnabas**

233.    Between 1999 and 2001, the average length of stay decreased by 2 days from 23.5 days to 21.5 days, a decrease of 8.51%.

234.    Between 1999 and 2001, Saint Barnabas' average routine charges per day increased by $1,657 from $2,134 to $3,785, an increase of 77.37%.

235.    Between 1999 and 2001, Saint Barnabas' average ancillary charges per day increased by $382 from $1,516 to $1,898, an increase of 25.20%.

236.    Between 1999 and 2001, Saint Barnabas' outlier cases cumulatively increased by 701 cases from 886 in 1999.

237.    Between 1999 and 2001, Saint Barnabas' outlier payments cumulatively increased by $23,187,192 from $12,782,777 in 1999.

**O.** ████████

██████████████████████████████████████████

████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████

242. ███████████████████████████████████

███████████████████████████

**P.    St. Peter's**

243.    Between 1999 and 2001, the average length of stay decreased by 2.4 days from 22.4 days to 20 days, a decrease of 10.71%.

244.    Between 1999 and 2001, St. Peter's average routine charges per day increased by $1,534 from $2,157 to $3,691, an increase of 71.12%.

245.    Between 1999 and 2001, St. Peter's average ancillary charges per day increased by $934 from $1,237 to $2,171, an increase 75.51%.

246.    Between 1999 and 2001, St. Peter's outlier cases cumulatively increased by 376 cases from 533 in 1999.

247.    Between 1999 and 2001, St. Peter's outlier payments cumulatively increased by $13,342,995 from $5,411,051 in 1999.

**Q.    UMDNJ**

248.    Between 2000 and 2001, the average length of stay decreased by 1.3 days from 27.1 to 25.8, a decrease of 4.80%.

249.    Between 2000 and 2001, UMDNJ's average routine charges per day increased by $1,081 from $2,646 to $3,727, an increase of 40.85%.

250.    Between 2000 and 2001, UMDNJ's average ancillary charges per day increased by $989 from $1,732 to $2,721, an increase of 57.10%.

251.    Between 2000 and 2001, UMDNJ's outlier cases cumulatively increased by 68 cases from 200 in 2000.

252. Between 2000 and 2001, UMDNJ's outlier payments cumulatively increased by $3,830,417 from $3,903,553 in 2000.

**R.    Warren**

253. Between 1998 and 2001, the average length of stay decreased by 13.5 days from 28.7 days to 15.2 days, a decrease of 47.04%.

254. Between 1998 and 2001, Warren's average routine charges per day increased by $1,721 from $1,028 to $2,749, an increase of 167.41%.

255. Between 1998 and 2001, Warren's average ancillary charges per day increased by $2,100 from $859 to $2,959, an increase of 244.47%.

256. Between 1998 and 2001, Warren's outlier cases cumulatively increased by 572 cases from 231 in 1998.

257. Between 1998 and 2001, Warren's outlier payments cumulatively increased by $10,910,081 from $872,040 in 1998.

**XI.    DAMAGES**

258. The United States was damaged and continues to be damaged because of the acts of defendants in submitting and causing to be submitted false claims, statements and records in that it paid the defendants for items and services for which they were not entitled to reimbursement.

259. As a result of the fraudulent scheme, the United States has incurred damages over $1 billion.

**FIRST CAUSE OF ACTION**
(False Claims Act:  Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

260. Relators repeat and reallege ¶¶ 1 through 259 as if fully set forth herein.

261.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

262.    By virtue of the false or fraudulent claims made or caused to be made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, which are to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## SECOND CAUSE OF ACTION
(False Claims Act:  Making or Using False Record or Statement
to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(2))

263.    Relators repeat and reallege ¶¶ 1 through 262 as if fully set forth herein.

264.    Defendants knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendants when submitting the UB – 92s to the Fiscal Intermediaries to get false or fraudulent outlier claims paid by the United States.

265.    By virtue of the false records or false statements made or caused to be made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, which are to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## THIRD CAUSE OF ACTION
(Payment by Mistake of Fact)

266.    Relators repeat and reallege ¶¶ 1 through 265 as if fully set forth herein.

267.    This is a claim for the recovery of monies paid by the United States to the defendants as a result of mistaken understandings of fact.

268.    The false claims which defendants submitted or caused to be submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

269.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of the hospital defendants' certifications and representations made or caused to be made by defendants, paid defendants certain sums of money to which they were not entitled, and defendants are thus liable to account and pay such amounts, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

### FOURTH CAUSE OF ACTION
(Unjust Enrichment)

270.    Relators repeat and reallege ¶¶ 1 through 269 as if fully set forth herein.

271.    This is a claim for the recovery of monies by which all defendants have been unjustly enriched.

272.    By directly or indirectly obtaining Government funds to which they were not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

### FIFTH CAUSE OF ACTION
(Common Law Fraud)

273.    Relators repeat and reallege ¶¶ 1 through 272 as if fully set forth herein.

274.    Defendants made or caused to be made material and false representations in UB-92 forms submitted to the Fiscal Intermediaries in connection with their requests

for outlier payments, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon defendants' misrepresentations by making payments on the false claims.

275. Had the true facts been known to the United States, defendants would not have received the fraudulent outlier payments described hereinabove.

276. By reason of these false representations, the United States has been damaged in an amount in excess of $ 1 Billion.

### PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States, demand and pray that judgment be entered in their favor against defendants, jointly and severally, as follows:

1. On the First and Second Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2. On the Third and Fourth Causes of Action, for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which the defendants were unjustly enriched, plus interest, costs, and expenses, and all such further relief as may be just and proper;

3. On the Fifth Cause of Action, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper;

4. For all attorneys' fees and costs of this Civil Action pursuant to 31 U.S.C. § 3730(d)(1).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November, 2002, I caused an original of this Complaint to be filed under seal and in camera for sixty (60) days and not to be served on the defendants named herein until further order of this Honorable Court.

_____
John E. Riley